IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

BARRON O'HARA,                          )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )  CIVIL ACTION NO. 10-00448-N
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
        Defendant.                      )

ORDER

Plaintiff  Barron O'Hara filed this action seeking judicial review of a final

decision of the Commissioner of Social Security ("Commissioner") that he was not

entitled to disability insurance benefits  ("DIB") and Supplemental Security Income

("SSI") under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C.  §§ 401-

433 and 1381-1383c.  This action has been referred to the undersigned Magistrate Judge

to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C.

§ 636(c) and Fed. R.Civ.P. 73 (doc. 20) and pursuant to the consent of the parties (doc.

18).   Further, the parties' joint motion to waive oral arguments (doc. 22) was granted on

August 31, 2011 (doc. 23).  Upon consideration of the administrative record (doc. 12),

and the parties' respective briefs (docs. 14, 15 and 16),  the undersigned concludes that

the decision of the Commissioner is due to be **REMANDED** for further evaluation of

plaintiff's alleged mental retardation.

I.  Procedural History.

Plaintiff, Barron O'Hara, filed an application  for  SSI benefits on October 27,

2006, claiming an onset of disability as of October 13, 2005 (Tr. 105-112).  Plaintiff's

application was denied on December 5, 2006 (Tr. 55-64).  A hearing before an

Administrative Law Judge ("ALJ") was requested (Tr. 67-69).  Following a hearing on

January 22, 2009 (Tr. 20-52), the ALJ issued an unfavorable decision (Tr. 9-16).  The

ALJ determined that plaintiff was not disabled as defined in the Social Security Act (Tr.

16).  Plaintiff requested a review by the Appeals Council (Tr. 4-5) which was denied on

July 12, 2010 (Tr. 1-3), thereby making the ALJ's decision the final decision of the

Commissioner.  *See* 20 C.F.R. § 404.981 (2009).[1]  Plaintiff appeals from that decision

and all administrative remedies have been exhausted.

   II.  Issue on Appeal.

       Plaintiff alleges that the ALJ erred in rejecting the opinion of Donald W. Blanton,

Ph.D. and determining that plaintiff did not meet Listing 12.05C.

   III.  Statement of Facts.

       A.  Medical Evidence.

       On July 23, 2008, plaintiff was examined by Donald W. Blanton, Ph.D. at the

request of plaintiff's attorney (Tr. 257).   Dr. Blanton conducted a mental status

evaluation and administered objective intelligence and academic testing.  On the Wide

Range Achievement Test (WRAT-III), plaintiff's scores placed his spelling and

arithmetic skills on the second grade level and reading skills on the third grade level (Tr.

259).  On the Wechsler Adult Intelligence Scale (WAIS-III), plaintiff achieved a Verbal

IQ score of 68, a Performance IQ score of 65, and Full Scale IQ score of 64, placing

---

[1] All references to the Code of Federal Regulations (C.F.R.) are to 1 the 2010 edition. All
references to the Code of Federal Regulations are to part 404, which addresses claims under Title II of the
Act. All of the cited regulations have parallel citations in part 416, which addresses claims under Title
XVI and which are not cited in this Brief.

plaintiff in the mild mentally retarded range (Tr. 258).   Dr. Blanton considered the scores

valid.  Dr. Blanton indicated plaintiff was functionally illiterate and put good effort into

his work. (Tr. 257-260).  Dr. Blanton opined that Plaintiff was markedly limited[2] in the

following areas: understanding, remembering, and carrying out detailed or complex

instructions; using judgment in detailed or complex work related decisions; responding to

customary work pressure; and maintaining attention, concentration, and pace for a period

of at least two hours (Tr. 260).

The record before the ALJ also included an opinion by an individual identified as

Robert Estock[3], stating that based on his  December 15, 2006 review of plaintiff's

medical records, plaintiff had no medically determinable impairment (Tr. 220) .  It is

questionable, however, whether Robert Estock even considered Dr. Blanton's opinion or

plaintiff's IQ test scores inasmuch as he made no notation or comment regarding the

opinion or the IQ test scores.  *See*, TR. 224 and 232.   In addition, there is no indication

either that Robert Estock ever personally interviewed or examined the plaintiff or that his

review and opinion were relied upon in any manner by the ALJ.

        B.   Other Evidence.

Plaintiff testified at the January 22, 2009 administrative hearing that he dropped

out of school in the tenth grade and had been in special education since the third grade;

---

[2] Dr. Blanton defined a marked limitation as one that "seriously interfere[s] with his ability to function and perform work related activities on a day to day basis in a routine work setting" (Tr. 260).

[3] According to the Commissioner's counsel, Robert Estock is a psychiatrist. (Doc. 15 at n. 2, *citing* Program Operations Manual System (POMS) DI 26510.090).   The undersigned was unable to verify counsel's contention that the "Code" designation of "37" (Tr. 220) indicates either that Robert Estock is a physician or that his "specialty is psychiatry."  (*Id.*).

he reported he had trouble focusing and could not do the work.(Tr. 25).  Plaintiff also

testified he could read and write very little (Tr. 25) and that he could add and subtract

very little. (Tr. 27).  Plaintiff further testified that that his sister and mother assisted him

in completing job applications, about which he was informed by friends (Tr. 27), and his

application for disability benefits. (Tr. 44-45). The Physical Activities Questionnaire of

November 11, 2006, indicates plaintiff's sister completed the form. (Tr. 139). Likewise,

plaintiff's sister completed the Daily Activities Questionnaire of November 13, 2006. (Tr.

156).  According to the plaintiff, none of his past jobs required any reading or writing.

(Tr. 29).  Plaintiff also testified that, although he sometimes washes his dishes and

sweeps, he never mops and does not do laundry, go grocery shopping or cook other than

heating things up in the microwave. (Tr. 38-39).

A vocational expert ("VE"), Dr. Patrick Sweeney, testified at the hearing that,

based on his "review of the file,"  plaintiff's past relevant work involved "cleaning and

janitorial activity" which gave Dr. Sweeney "two choices where I could go."  (Tr. 45).

Dr. Sweeney described the choices as follows:

> VE: . . . One, being commercial cleaner.  And he clearly was with a firm
> that had commercial accounts.  But he seemed to specialize in floors and
> rugs.
>
> CLMT:      Right.[4]
>
> VE:    And so, there is a well-defined DOT job called rug cleaner.  It's a,
> it's a different job than commercial cleaner, but it's somewhat subsumed
> under that.  Both are medium level exertion and semi-skilled.  So, it's kind
> of a trade off there, but I'm going to go with rug cleaner.  The DOT number

---

[4] Plaintiff had previously testified that he was "a janitor doing floor work and [] lifting heavy
equipment like scrubbers and buckets and machines and that."  (Tr. 27).

is 361.682-010. Again, medium and semi-skilled. And again, my alternative would also be medium and semi-skilled. So, I don't think we're giving up anything there. I believe he worked in a kind of warehouse or industrial setting where he would, I think, be termed a loader/uploader. Maybe loaded trucks and handled goods and –

(Tr. 46). In response to the ALJ's first hypothetical, Dr. Sweeney testified that "such an individual [could] perform other work in the economy" as follows:

> A job that's light and unskilled, no documented public contact, repetitive tasks, simple work, is called folding machine operator. And specifically we're talking paper folding. And although the word machine attracts our attention there, he loads the machine, it runs, he watches, it stops, he unloads the machine. So, he's not fooling with the machine while, while it's running. It meets all your criteria. The DOT on that is 208.685-014. In Alabama they show the employment 2190, that's 2190. And nationwide, 160,000. A, a job, another job, light and unskilled, repetitive, no contact with the public, it's, it's slot tag inserter. The work would be like in a, in a firm that distributes mail or is involved with other types of shipping and receiving. And what it is, it's inserting the address tag into a little holder on the particular stacks of boxes. The DOT on that is 222.567-018. And the employment in Alabama is reported to be over 1270, that's 1270. Nationwide economy, over, over 150,000. Another job would be light and unskilled. It's called a checker. Sometimes in the common terms people might call it greeter. You see these folks, like for instance, in Wal-Mart, but not, not restricted there. They'll validate that the person has paid for their goods and see the items leaving in the buggy. The DOT on that is 222.687-010. Again, it's light, it's unskilled. The contact with the public is quite casual. The DOT doesn't even list public contact as a, as a factor. In Alabama the employment is reported to be over 5700, that's 5700. And nationwide the economy is over one million. So, that would be three, Your Honor, that would meet your criteria.

(Tr. 38-39). In response to the ALJ's second hypothetical,[5] Dr. Sweeney testified as follows:

---

[5] The principle difference between the first two hypothetical questions is that, in the first, the ALJ classified the individual as being capable of performing "light work" (Tr. 47) while, in the second, the ALJ restricted the individual to "sedentary work. (Tr. 49).

> A job that's sedentary, unskilled, is in the garment industry. The name of the job is cuff folder. . . Employment – the DOT is 685.687.014. The employment in Alabama is reported to be over 1094, 1094. In the U.S. economy over 50,000. Another job in the optical retail area, lens inserter, as lens in glasses. Sedentary, unskilled. The DOT is 713.687-026. The employment in Alabama is reported to be over 1500, that's 1500. In the nation, national economy over 100,000. And I'll do one more. In the, again, in the garment industry, sedentary, unskilled, the job title is puller . . . And, again, it's turning gloves, for instance, inside out after manufacture. DOT 782.687-030. A little over 1000 employed in Alabama. Over 50,000 in the U.S. economy. So, that would be three at your, at your sedentary hypothetical, Your Honor.

(Tr. 49-50). Finally, in response to a third hypothetical, which restricted an individual to being "limited to the degree described by the claimant in testimony today, and also to the degree identified by Dr. Blant[on] in his report of July 23rd 2008" (Tr. 50), Dr. Sweeney testified that such an individual could **not** "perform the cited employment or any other work in competitive employment" (Tr. 50, emphasis added).

C.   Administrative Law Judge's Decision.

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date, October 13, 2005 (Tr. 11). She then found that Plaintiff had severe impairments—type II diabetes mellitus with probable diabetic neuropathy, hypertension, history of umbilical hernia with surgical repair and residual abdominal pain complains of uncertain etiology, and adjustment disorder with depression and anxiety (Tr. 11)—that did not meet or equal an impairment listed at 20 C.F.R. pt. 404, subpt. P, app. 1 (Tr. 12). After considering the entire record, the ALJ concluded that Plaintiff could perform a reduced range of light work that involved no more than simple repetitive tasks and casual contact with the general public (Tr. 13). Finally, the ALJ concluded that although Plaintiff's residual functional capacity precluded him from performing his past relevant

work (Tr. 14), he was capable of performing work that existed in significant numbers in

the national economy (Tr. 15). Thus, the ALJ found that Plaintiff was not disabled within

the meaning of the Act (Tr. 16).

The ALJ discounted the opinion of Dr. Blanton regarding plaintiff's mental

retardation on the following grounds:

> [I]ndications of mild retardation and endorsements of disability benefit
> entitlement by the claimant's representative's source of consultative advocacy
> are not found to carry any significant weight.  The record as a whole contains
> ***no evidence supporting a mental retardation diagnosis***.  This is further
> supported by the fact that he has ***semi-skilled past relevant work experience***
> and has ***no evidence of deficits in adaptive functioning*** which would suggest
> mental retardation.  However, in viewing the evidence in a light most favorable
> to the claimant, the undersigned has included the examiner's (Dr. Blanton)
> diagnostic impression of an adjustment disorder with depression and anxiety
> despite the lack of any mental health treatment or allegations of depression and
> anxiety.

(Tr. 14, emphasis added).


IV. Conclusions of Law.

A.    Standard of Review.

In reviewing claims brought under the Act, this Court's role is a limited one.

Specifically, the Court's review is limited to determining: 1) whether the decision is

supported by substantial evidence, and 2) whether the correct legal standards were

applied. *See*, 42 U.S.C. §  405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999);

Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Thus, a court may not decide

the facts anew, reweigh the evidence, or substitute its judgment for that of the

Commissioner.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996);  Sewell v. Bowen,

792 F.2d 1065, 1067 (11th Cir. 1986).  Rather, the Commissioner's findings of fact must

be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d

1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400;  Brown v. Sullivan, 921 F.2d 1233,

1235 (11th Cir. 1991).  *See also*, Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir.

1990)("Even if the evidence preponderates against the Secretary's factual findings, we

must affirm if the decision reached is supported by substantial evidence."); Bloodsworth

v. Heckler, 703 F.2d 1233, 1239 (11th Cir.  1983) (finding that substantial evidence is

defined as "more than a scintilla but less than a preponderance," and consists of "such

relevant evidence as a reasonable person would accept as adequate to support a

conclusion[ ]"). In determining whether substantial evidence exists, a court must view the

record as a whole, taking into account evidence favorable as well as unfavorable to the

Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009);

Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792

F.2d 129, 131 (11th Cir. 1986).

> B. Applicable Law – Evaluation of Medical Opinions.

The ALJ must evaluate every medical opinion she receives. 20 C.F.R.

§ 404.1527(d). In deciding how much weight to give a medical opinion, the ALJ

considers the following factors:

> • The examining relationship between the individual and the "acceptable
> medical source";
>
> • The treatment relationship between the individual and a treating source,
> including its length, nature, and extent as well as frequency of examination;
>
> • The degree to which the "acceptable medical source" presents an
> explanation and relevant evidence to support an opinion, particularly
> medical signs and laboratory findings;
>
> • How consistent the medical opinion is with the record as a whole;

> • Whether the opinion is from an "acceptable medical source" who is a specialist and is about medical issues related to his or her area of specialty; and
>
> • Any other factors brought to our attention, or of which we are aware, which tend to support or contradict the opinion.

Social Security Ruling (SSR) 06-03p, available at 2006 WL 2329939, at *3. "[W]hen other evidence in the record supports a conclusion contrary to the opinion of an examining physician, the [Commissioner's] regulations allow the ALJ to reject the opinion of the examining physician." Warncke v. Harris, 619 F.2d 412, 417 (5th Cir. 1980). *See also* Marbury v. Sullivan, 957 F.2d 837, 840 (11th Cir. 1992)("An ALJ sitting as a hearing officer abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians: 'Absent a good showing of cause to the contrary, the opinions of treating physicians must be accorded substantial or considerable weight by the Secretary'."), *quoting* Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988).

> C.      Applicable Law – Mental Retardation.

In order to establish disability due to the presence of a mental retardation, a claimant must satisfy the requirements for that listing in appendix 1, which vary depending the claimant's IQ score. *See e.g.*, Abbott v. Sullivan, 905 F.2d 918, 923-24 (6th Cir. 1990)(Most of the listings for mental impairment contained in appendix 1 impose two requirements: first, that the claimant possess certain particular signs or symptoms which are generally found in paragraph A of each listing and, therefore, referred to as the "A criteria"; and second, that the symptoms result in a specific degree of functional limitation which are set forth in paragraph B of the listings and, therefore,

referred to as the "B criteria.").   The listing for mental retardation contained in appendix

1 differs from nearly all of the other listings in that it does not require a claimant to

satisfy the "B criteria" in all cases.  905 F.2d at 924.   For example, "[t]he listing allows

for a finding of disability due to mental retardation where test scores below 59 on the

Wechsler Adult Intelligence Scale (WAIS) are achieved, without any direct proof of

functional incapacity."  *Id*.  The listing for mental retardation provides specifically as

follows:

> Mental Retardation: Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; or
>
> B. A valid verbal, performance, or full scale IQ of 59 or less; or
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation or function; or
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following;
>
>> 1. Marked restriction of activities of daily living; or
>> 2. Marked difficulties in maintaining social functioning; or
>> 3. Marked difficulties in maintaining concentration, persistence or pace; or
>> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05. In other words, Mental retardation is significant subaverage intelligence accompanied by "significant limitations in adaptive functioning." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 42 (4th ed. text revision 2000) (DSM-IV). Significantly subaverage intelligence alone is insufficient: "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." *Id.* at 42.

An ALJ may disregard standardized IQ test scores, however, where they are inconsistent with Plaintiff's daily activities and behavior. *See* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992); Popp v. Heckler, 779 F.2d 1497 (11th Cir. 1986). Past semi-skilled work is inconsistent with mental retardation. *See* Outlaw v. Barnhart, 197 F. App'x 825, 827 & n.1 (11th Cir. 2006) (unpublished) (finding semi-skilled work history inconsistent with mental retardation).

D. Applicable Law – Listing 12.05C.

To meet the criteria of Listing 12.05C, plaintiff is required to establish: (1) a valid IQ score of 60 to 70 inclusive; and a physical or other mental impairment imposing additional and significant work-related limitation of function. Lowery v. Sullivan, 979 F.2d 835, 837 (11ᵗʰ Cir. 18992); 20 CFR 404, Subpart P, Appendix 1, § 12.05C. The "capsule definition" of mental retardation set forth in § 12.05 of the Listings states that "[m]ental retardation refers to a significantly subaverage general intellectual functioning with ***deficits in adaptive behavior*** initially manifested during the developmental period (before age 22)." *Id*. (emphasis added). This capsule definition of mental retardation is fully consistent with the accepted medical standards, which recognize deficits in adaptive

functioning as one of the criteria (along with IQ scores of about 70 or below) necessary

for a diagnosis of mental retardation. See Diagnostic and Statistical Manual of Mental

Disorders – Text Revision (DSM-TR).    The DSM-TR further explains:

> The essential feature of Mental Retardation is significantly subaverage
> general intellectual functioning (Criteria A) that is accompanied by
> significant limitations in adaptive functioning in at least two of the
> following skill areas: communication, self-care, home living,
> social/interpersonal skills, use of community resources, self-direction,
> functional academic skills, work, leisure, health, and safety (Criteria B).

DSM-IV 39. Thus, an individual with an IQ score lower than 70 does not necessarily

satisfy the criteria for a diagnosis of mental retardation.    Specifically, "[m]ental

retardation would not be diagnosed in an individual with an IQ lower than 70 if there are

no significant deficits or impairments in adaptive functioning." DSM-IV 39-40.  *See also*

Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992), *citing* Popp v. Heckler, 779 F.2d

1487, 1499 (11th Cir. 1986)(holding a valid IQ score is not necessarily conclusive of

mental retardation where the score is inconsistent with other evidence of claimant's daily

activities).  The burden of proof lies with the plaintiff.  *See* Bowen v. Yuckert, 482 U.S.

137, 146 (1987) (generally, the burden to prove disability in a Social Security case is on

the claimant); Flynn v. Heckler, 768 F.2d 1273, 1274 (11th Cir. 1985) (Plaintiff bears the

burden of demonstrating that the Commissioner's decision, as affirmed by the district

court, is not supported by substantial evidence.).

E.      Analysis.

In his decision, the ALJ declared that he gave no "significant weight" to Dr.

Blanton's assessment and opinion of mild mental retardation (Tr. 14).[6]    The ALJ

specifically concluded that there was "no evidence supporting a mental retardation

diagnosis. (*Id*.).   The Commissioner argues that "the ALJ articulated legally adequate

reasons for discounting Dr. Blanton's opinion [because] . . . Dr. Blanton's opinion that

Plaintiff was mildly mentally retarded . . . was inconsistent with Plaintiff's daily

activities."   (Doc. 15 at 7).   However, neither the ALJ nor the Commissioner has

delineated in what specific manner plaintiff's daily activities are inconsistent with a

diagnosis of mild retardation beyond reference to plaintiff's alleged "semi-skilled past

relevant work experience."  (Tr. 14; Doc. 15 at 7, 8, 11 and 12).   Further, it appears the

only basis for the determination that plaintiff's past relevant work was "semi-skilled" was

the testimony of the Vocational Expert, Dr. Sweeney.   Plaintiff  now argues that the

principal basis for the ALJ's decision, namely the "semi-skilled" nature of plaintiff's past

relevant work, was incorrect or, at the very least, questionable.  The undersigned concurs.

The Commissioner does not dispute that, within the Department of Labor's

*Dictionary of Occupational Titles* (4th ed. 1991), otherwise referred to as DOT, there

exists a job with the title "commercial cleaner" which is identified as DOT 381-687-014.

The listing for this job includes a "specific vocational preparation" (hereafter "SVP") of

2, which indicates  a job that can be learned in one month or less (Tr. 178-179).

---

[6] The ALJ did include Dr. Blanton's diagnostic opinion that plaintiff suffered "an adjustment disorder with depression and anxiety despite the lack of any mental health treatnment or allegations of depression and anxiety."  (Tr. 14).

According to the Social Security Regulations, a job that can be learned in one month or

less is classified as unskilled work.  20 C.F.R. 404.1568(a).   The Commissioner does not

take issue with this contention but, instead, essentially argues[7] that, because Dr. Sweeney

testified that plaintiff's past relevant work could also be identified as "rug cleaner,"

otherwise known as DOT 361.682-010, which has a SVP of 4 and is thus semi-skilled,

the evidence is sufficient to support the ALJ's finding that plaintiff performed semi-

skilled work and, therefore, there exists "no evidence supporting a mental retardation

diagnosis." (Doc. 15 at 8-9; Tr. 14).   As illustrated above, Dr. Sweeney's testimony was

not so direct or limited.  Dr. Sweeney not only acknowledged that the "job called rug

cleaner . . . [is] a different job than commercial cleaner" but also stated that, with respect

to plaintiff's past relevant work, "it's kind of a trade off" because he believed they were

both "semi-skilled."  (Tr. 46).  Although Dr. Sweeney ultimately "[went] with rug

cleaner,"  his opinion appears erroneous to the extent he believed them to both be semi-

skilled jobs.  Further, the vocational consultant who completed the Vocational Rationale

Form on December 4, 2006, identified plaintiff's past relevant work as "commercial

cleaner" with the DOT number of 381.687-014.  (Tr. 157).  It is unclear whether, in his

review of the record, Dr. Sweeney considered  this  Vocational Rationale Form.  In

---

[7] The Commissioner specifically argues that:

> It is Plaintiff that is mistaken. The vocational expert testified that Plaintiff had past
> relevant work as a commercial cleaner, rug cleaner, and loader/uploader, which were all
> semi-skilled work jobs (Tr. 46). Plaintiff argues that commercial cleaner, DOT No. 381-
> 687-014, is an unskilled job with an SVP of 2 (Pl. Br. 3). The only DOT number
> identified by the vocational expert, however, was DOT No. 361.682-010 (Tr. 46).
> According to the DOT, rug cleaner (DOT No. 361.682-010) has an SVP of 4, making it a
> semi-skilled job.

(Doc. 15 at 8-9)(citation omitted).

addition to the questionable basis for designating plaintiff's past relevant work as "semi-skilled," there is no indication that the ALJ considered, with respect to her conclusion that there is "no evidence of deficits in adaptive functioning which would suggest mental; retardation" (Tr. 14), the evidence in the record which at least appears to support Dr. Blanton's opinion. Specifically, the evidence that plaintiff's sister and mother helped him complete not only the applications he submitted for jobs his friends informed him about (Tr. 27) but his application for disability benefits (Tr. 44-45); that he dropped out of school in the tenth grade after having been in special education classes since the third grade because he had trouble focusing and could not do the work (Tr. 25); that he could only read and write very little (Tr. 25); that he could add and subtract very little (Tr. 27); that he was unable to cook other than heating food up in the microwave (Tr. 37-38), or do his laundry or housecleaning beyond sometimes sweeping (Tr. 38), or go grocery shopping (Tr. 39). Further, the Physical Activities Questionnaire of November 11, 2006, indicates that this form was completed by his sister (Tr. 139). Likewise, claimant's sister completed the Daily Activities Questionnaire dated November 13, 2006 (Tr. 156). Plaintiff's testimony during the hearing was consistent with these questionnaires.

For the reasons stated above, the ALJ's decision to reject Dr. Blanton's diagnosis of mild mental retardation, and conclusion that there exists in the record "no evidence supporting a mental retardation diagnosis" (Tr. 14), is not supported by substantial evidence as required to uphold this decision. There is, however, also insufficient evidence to declare that the plaintiff is, as a matter of law, entitled to benefits. For example, the record in this case contains insufficient evidence regarding the existence of any "***deficits in adaptive behavior,***" as required by the applicable regulations. *See* 20

CFR 404, Subpart P, Appendix 1, § 12.05C (emphasis added).  Consequently, the

undersigned must reject plaintiff's invitation to enter judgment in his favor for benefits

(docs. 14 at 5-6 and 16 at 3).

  V. <u>Conclusion</u>.

  For the reasons stated above, it is **ORDERED** that the decision of the

Commissioner denying plaintiff's application for DIB and SSI benefits  be hereby

**REVERSED** and **REMANDED** for further evaluation of plaintiff's alleged mental

retardation.

  This remand makes the plaintiff a prevailing party for purposes of the Equal

Access to Justice Act, 28 U.S.C. § 2412, and terminates this Court's jurisdiction over this

matter.

  **DONE** this  9<u>th</u>  day of August, 2011.

        <u>/s/ Katherine P. Nelson</u>
        **KATHERINE P. NELSON**
        **UNITED STATES MAGISTRATE JUDGE**